```
1                         UNITED STATES DISTRICT COURT
                          DISTRICT OF COLUMBIA DISTRICT
2

3   ------------------------------------------------------------
                                        )
    UNITED STATES OF AMERICA,           )   File No. 21-cr-526
4                                       )            (TSC)
              Plaintiff,                )
5                                       )
    vs.                                 )   Washington, D.C.
6                                       )   February 13, 2023
    JEFFERY FINLEY,                     )   1:30 p.m.
7                                       )   Courtroom 9
              Defendant.                )   Courthouse Annex
8                                       )
    ------------------------------------------------------------
9
                    BEFORE THE HONORABLE TANYA S. CHUTKAN
10                      UNITED STATES DISTRICT COURT JUDGE
                                (SENTENCING HEARING)
11

12   APPEARANCES
       For the Plaintiff:        UNITED STATES ATTORNEY'S OFFICE
13                               JASON BRADLEY ADAM McCULLOUGH,
                                 AUSA
14                               555 4th Street, NW
                                 Washington, D.C. 20530

15     For the Defendant:        FEDERAL PUBLIC DEFENDER OFFICE
                                 AARON DAVID MOSS, ESQ.
16                               651 Foxcroft Avenue
                                 Suite 202
17                               Martinsburg, West Virginia 25401

18     For Probation:            JESSICA REICHLER

19     Court Reporter:           CARLA R. BEBAULT, RMR, CRR, FCRR
                                 Suite 146 U.S. Courthouse
20                               316 North Robert Street
                                 Saint Paul, Minnesota 55101

21

22

23

24        Proceedings recorded by mechanical stenography;
     transcript produced by computer.

25
```

1              **P R O C E E D I N G S**

2               **IN OPEN COURT**

3

4          THE COURT:  Good afternoon.

5          MR. MCCULLOUGH:  Good afternoon.

6          COURTROOM DEPUTY:  Your Honor, we have criminal

7   action 21-526, United States of America versus Jeffery

8   Finley.  We have Mr. Jason McCullough representing the

9   government and Mr. Aaron Moss representing Mr. Finley.  And

10  we also have Ms. Jessica Reichler representing probation.

11         THE COURT:  All right.  Good afternoon.  Good

12  afternoon, Mr. Finley.

13         THE DEFENDANT:  Good afternoon, Your Honor.

14         THE COURT:  We are here for the sentencing of

15  Mr. Finley who has pleaded guilty to Entering and Remaining

16  in a Restricted Building or Grounds in violation of 18

17  U.S.C., Section 1752(a)(1).  This is a Class A misdemeanor

18  to which the United States Sentencing Guidelines apply.

19         Mr. Finley, do you have family in the courtroom

20  today?

21         THE DEFENDANT:  I have my mother with me.

22         THE COURT:  Good afternoon.

23         All right.  And in preparation -- and by the way,

24  I just got 15 minutes ago the pretrial service compliance

25  report.  This is a recurring peeve of mine is that I get

1    these minutes before a hearing and sometimes after a

2    hearing.  I have complained about it in the past.  But

3    anyway, have you all had a chance to see it?  You haven't?

4          MR. MOSS:  Your Honor, we were travelling when it

5    was disclosed.

6          THE COURT:  You can see my copy.  You do have a

7    copy?  Go ahead.  He's in compliance.  There have been some

8    blips, but he's in compliance.

9          All right.  In addition to the pretrial services

10   report which I have just mentioned, in preparation for this

11   hearing today I have received and reviewed the presentence

12   report and the sentencing recommendation from the probation

13   department which you all should have seen as well.  And the

14   following documents were submitted by counsel before this

15   hearing:

16         The plea agreement and statement of offense signed

17   by Mr. Finley, which I reviewed at the plea hearing; a

18   sentencing memoranda from the government and from

19   Mr. Finley; a sentencing table from the government; and a

20   sealed exhibit that was filed by Mr. Finley, which is a

21   report.

22         So that's what I'm working from.  Is there

23   anything else?

24         MR. MOSS:  No, Your Honor.

25         THE COURT:  All right.  I did have a conversation

4

1    for literally a couple minutes just before this hearing with

2    the probation officer because I noticed probation's

3    recommendation was for six months of incarceration, which I

4    thought was unusual for a case like this, and I compared it

5    to the recommendations in other cases that -- similar cases,

6    especially where the defendant has absolutely no prior

7    record, and I don't -- I didn't recall any incarceratory

8    sentence being recommended, much less one that exceeded the

9    Government's request.

10          The probation officer Ms. Reichler informed me

11   that it was due in part to Mr. Finley's role as head of a

12   branch of the West Virginia Proud Boys, as well as his

13   leadership in and encouragement of others on the day of

14   January 6th.  But I just wanted to let you know about that

15   conversation because I don't like there to be information

16   that I'm proceeding on that you all aren't made aware of.

17          All right.  Let me begin with the presentence

18   report, which the final presentence report and sentencing

19   recommendation were filed on January 30th, 2023.  Probation

20   indicated that the parties do not have any objection to the

21   factual recitation in the presentence report.

22          Mr. Moss.

23          MR. MOSS:  Yes, Your Honor.

24          THE COURT:  Have you and Mr. Finley read and

25   discussed the presentence report?

```
1              MR. MOSS:  We have, Your Honor.

2              THE COURT:  Are there any disputed issues of fact?

3     That is, does Mr. Finley have any objections to any of the

4     factual statements set forth in the presentence report?

5              MR. MOSS:  No, Your Honor.

6              THE COURT:  Mr. McCullough, are you -- oh, I'm

7     sorry.  Mr. Finley, are you satisfied with the services of

8     your attorney, Mr. Moss, in this case?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  All right.  Do you feel that you've

11    had enough time to talk with him about the probation

12    department's presentence report and the papers filed by the

13    government in connection with the sentencing?

14             THE DEFENDANT:  I have, Your Honor.

15             THE COURT:  Mr. McCullough, is there -- do you

16    have any objection to any of the factual determinations set

17    forth in the presentence report?

18             MR. MCCULLOUGH:  No, Your Honor.

19             THE COURT:  You all may remain seated if you wish,

20    or you can come up to the podium, whatever you feel most

21    comfortable doing.  I just ask that you make sure that you

22    speak into the microphone when you're speaking.

23             Are you expecting any witnesses today,

24    Mr. McCullough, or any other evidence?

25             MR. MCCULLOUGH:  No, Your Honor.
```

1           THE COURT:  Okay.  Hearing no objection from

2     either side with regard to the factual recitations in the

3     presentence report, I will accept the factual recitation in

4     the presentence report regarding the circumstances of the

5     offense and the factual basis stated in the report will be

6     my findings in fact for purposes of sentencing.

7           Now, the presentence report lays out the probation

8     office's calculation of the advisory guideline range that

9     applies in this case and this calculation was done using the

10    2021 guidelines manual and is as follows:

11          Beginning with the guidelines offense level, the

12    applicable guideline in the case is Section 2B2.3(a) which

13    has a base offense level of 4.

14          Second 2B2.3(b)(1)(A)(vii), requires a two-level

15    increase because a trespass occurred at a restricted U.S.

16    government facility, the U.S. Capitol Building.  Section

17    3C1.1 requires a two-level increase for obstruction of

18    justice in that Mr. Finley deleted his social media accounts

19    and photos and videos of himself and other members of the

20    Proud Boys at the Capitol.  He also directed members of his

21    chapter to delete those photographs.

22          The government has represented that Mr. Finley

23    should be given credit for acceptance of responsibility in

24    this matter that entitles him to a two-level reduction under

25    Section 3E1.1(a).

1   Therefore, before I consider any departures or

2   variances, Mr. Finley's total offense level is 6.  Any

3   objections to this calculation of the offense level,

4   Mr. McCullough?

5   MR. MCCULLOUGH:  No, Your Honor.

6   THE COURT:  Mr. Moss?

7   MR. MOSS:  No, Your Honor.

8   THE COURT:  Turning to the criminal history

9   category, the Presentence Investigation Report has found

10  that Mr. Finley has zero prior convictions and received no

11  criminal history points in the guidelines manual.  Under

12  these convictions therefore -- or this lack of convictions

13  therefore give him a criminal history point subtotal of zero

14  which puts him in criminal history category of I.

15  Any objections to the criminal history

16  calculation, Mr. McCullough?

17  MR. MCCULLOUGH:  No, Your Honor.

18  THE COURT:  Mr. Moss?

19  MR. MOSS:  No, Your Honor.

20  THE COURT:  Based on the offense and the criminal

21  history category I've just described, the Presentence Report

22  calculates the guideline sentencing range to be 0 to 6

23  months of imprisonment.

24  Having determined the applicable guidelines range,

25  the next step is for me to consider departures and

1    variances.  The Presentence Report doesn't include any

2    departure grounds and under the terms of the plea agreement

3    into which the parties entered, both parties agree that

4    there are no grounds for imposing a sentence outside of the

5    guideline range that is based on policy statements in the

6    guidelines manual.

7            Neither party has made an argument that the Court

8    should vary from the guidelines range either.  Is that

9    correct, Mr. McCullough?

10           MR. MCCULLOUGH:  That is correct, Your Honor.

11           THE COURT:  Mr. Moss?

12           MR. MOSS:  Yes, Your Honor.

13           THE COURT:  Okay.  Now, Section 3553 requires me

14    to consider a variety of factors, including the sentencing

15    range that the guidelines prescribe, which I've just

16    described, and also the applicable penal statutes.

17           So the charge of Entering and Remaining in a

18    Restricted Building or Grounds in violation of 18 U.S.C.

19    1752(a)(1) carries a statutory maximum penalty of one year

20    imprisonment or up to five years of probation.  If a term of

21    imprisonment is imposed, the statutes and guidelines provide

22    that Mr. Finley faces a supervised release term following

23    imprisonment of not more than a year.  The statute of

24    conviction sets the maximum fine of up to $100,000, while

25    the guidelines fine range is between $1,000 and $9,500.  And

```
1    the plea agreement includes a provision for a restitution

2    order of $500 because there's an identified victim in this

3    case, the architect of the Capitol, and Mr. Finley has

4    agreed to pay restitution in the amount of $500 as part of

5    this plea agreement.

6              Counsel, have I stated accurately the statutory

7    and guideline framework here?

8              MR. MCCULLOUGH:  Yes, Your Honor.

9              MR. MOSS:  You have, Your Honor.

10             THE COURT:  All right.  As I have just mentioned

11   at the beginning, as you all are aware, because I do allow

12   the parties to get the probation recommendation, the

13   probation office has recommended 180 days of imprisonment,

14   12 months of supervised release, and $500 in restitution.

15   The recommendation of the probation office is not based on

16   any facts or circumstances that have not already been

17   disclosed to the parties in the presentence report.

18             So at this point I would like to give the parties

19   the opportunity to address the Court.

20             Mr. McCullough.

21             MR. MCCULLOUGH:  Your Honor, I'm coming to the

22   podium as I understand that to be your preference.

23             THE COURT:  Yes, yes.

24             MR. MCCULLOUGH:  Thank you, Your Honor.

25             Your Honor, I think the parties have laid out both
```

1    of their respective positions here, and I think that the

2    government has put forth its position in terms of the

3    recommended period of incarceration followed by supervised

4    release.  That is 90 days of incarceration followed by 12

5    months of supervised release from probation.

6          Your Honor, the government has put forward its

7    facts in support of that.  Fundamentally, from the

8    Government's perspective, obviously January 6th is a very

9    serious crime and one that could not have been accomplished

10    but for the masses of people that were willing to take

11    action in furtherance of the mob.

12          In Mr. Finley's case, his case is unique in -- in

13    this respect.  That he was part of a group that came

14    together to the Washington -- to the Capitol, to Washington,

15    D.C.  They met at the Washington Monument at 10:00 a.m.  He

16    then travelled basically under the direction and control of

17    the men that he had come to the Capitol with, or the group

18    that he had assembled with in Washington, D.C.  He was

19    available to follow their direction and control.  Their

20    command and control.

21          And that command and control took him away from

22    the headline activity of the day, that is the speeches that

23    were occurring at the Ellipse, and took him to the Capitol.

24    Mr. Finley willfully followed that.  Even though he may not

25    have had a full understanding of what was to take place,

1    Mr. Finley willfully followed the men that were directing

2    the group of nearly 200 men and women to the Capitol as they

3    surrounded, walked around the Capitol, waited approximately

4    two blocks from the Capitol for approximately 30 minutes

5    from 12:15 to 12:45, where they then moved into position

6    near the Peace Monument.

7           Mr. Finley willingly joined with that group as it

8    moved across the thresholds of the first barriers to be

9    breached at 12:53.  Mr. Finley looked to the leaders of that

10   group as the barriers were going down.  The video evidence

11   will show that he looks directly at them, follows them

12   directly onto Capitol grounds.  He then remains on the West

13   Plaza of the Capitol for a period of nearly two hours until

14   he regroups with another person that he recognizes as the

15   leader of his group as they regroup before entering the

16   Capitol.  So he has witnessed approximately two hours of

17   violence, mayhem, mob mentality, before then agreeing to go

18   to take the step further to go inside.

19          He spends very little time inside the Capitol.

20   It's approximately 8 minutes, and -- but he takes a selfie

21   photograph at the threshold of the Senator's office where

22   other members are inside celebrating.

23          Upon leaving he provides direction and advice to

24   others that are part of this group.  "If you leave, you're

25   not getting back inside, that's for sure."  He then provides

1  direction and advice to those members of his chapter that

2  had come with him to Washington, D.C. advising them to

3  delete their photos and evidence, himself deleting his

4  photos and evidence, his social media accounts.

5          And then, Your Honor, I think kind of tellingly,

6  takes publicly to social media not to necessarily protect

7  himself but to protect the group.  So recognizing that this

8  was the activity of a group, and recognizing that the group

9  faced some exposure -- whether just purely reputationally or

10  criminally individually -- and took to social media and made

11  a series of false statements that he knew to be false.  And

12  these are not 1001 chargeable criminal false statements, but

13  they are indicative of his mentality at the time which was

14  covering up for the crime on behalf of himself and, more

15  importantly, on the behalf of the group.

16          And so this is not an individual who kind of came

17  to Washington, DC, kind of overwhelmed by feelings about the

18  emotion and kind of let the day get away from him.  I think

19  the portrait that's painted here is someone that more coolly

20  and calculatingly followed in support of what other people

21  told him to do.

22          And so I think that under those circumstances

23  we've laid out the basis in terms of comparing for

24  sentencing disparities, and defense counsel has also very

25  admirably put up some of those cases as well.  We're happy

CARLA R. BEBAULT, RMR, CRR, FCRR

1    to kind of get into the guts of that.  But that's why the

2    government comes out with a 90-day sentence of incarceration

3    because it is kind of the cool, calculating effort to

4    further the objective of a group and to work with that group

5    and then to protect the members of that group that is of

6    significant concern, and it makes the participation in the

7    crime that much more significant for someone like

8    Mr. Finley, given the fact that he's there at the first

9    barriers and all the way through inside the Capitol.

10          Your Honor, there are a number of mitigating

11    factors, as the defense has raised, and the government would

12    be remiss in not noting those as well.  It is indeed a very

13    kind of tragic personal tale, and I would have no dispute

14    about that and I would say that I very much, both quite

15    personally, having met with Mr. Finley, he is an engaging

16    individual.  He is -- he has always been respectful and very

17    intelligent in terms of just the way that he carries

18    himself.

19          And, Your Honor, I think that there is a lot --

20    there is much that can be redeemed here without question.

21    And so he did not engage in any acts of violence, he did not

22    steal anything, he does not break anything at the Capitol;

23    but nonetheless, Your Honor, the willingness to go along in

24    support of a group in a -- on a day when the mob would not

25    have succeeded but for the mob.  It is -- it is the kind of

14

1    central defining feature of the crime, if you will, that

2    there were people that were willing to participate in it,

3    notwithstanding the fact that they fully appreciated that it

4    was wrong.  And so I think that that's what makes this

5    significant.  I think that's what makes Mr. Finley's case

6    significant.

7            And, Your Honor, I'll say -- and I talked to

8    defense counsel about this as well -- I think that the

9    government and the defense come at this from kind of two

10   different perspectives and kind of put this in your lap and

11   it's a difficult decision for a judge.  And I have to say

12   I -- this is one of those --

13           THE COURT:  That's why we get paid the big bucks.

14           MR. MCCULLOUGH:  Exactly, Your Honor, it is.  But

15   you have seen -- you're from a position where you've seen a

16   number of these, and this is just a genuine question right

17   now as to kind of what will most adequately serve deterrence

18   both on an individual level, on a more broader public level,

19   to make sure that this is the kind of crime that never

20   happens again and that Mr. Finley moves past this and goes

21   on with his life.

22           And, Your Honor, with that, the government takes

23   the position that a period of incarceration is appropriate

24   here, followed by the supervised release.  And we did not

25   come to, you know, kind of the community service as a, you

1    know, kind of afterthought throw in.  I actually think that

2    that is, the 60 hours of community service, also kind of a

3    thoughtful recommendation given the background, history of

4    Mr. Finley, that perhaps this can help engage him more in

5    more meaningful aspects of life.

6              Of course, the defense comes up and will say,

7    Look, a shorter period of incarceration followed by a longer

8    period of supervised release may make more sense.  Like I

9    said, Your Honor, this is why you get paid the big bucks.

10   We respectfully disagree with the defense but, Your Honor, I

11   think that that's the tension here; and I think probably

12   both sides, frankly, want to see this young man move past

13   this and succeed, and the government respectfully submits

14   that a short period of incarceration -- and any period of

15   incarceration is serious -- but a period of incarceration of

16   90 days is appropriate in this case and will reflect the

17   seriousness of the crime and Mr. Finley's participation in

18   it.

19             Unless Your Honor has any questions for me?

20             THE COURT:  No.  Thank you, Mr. McCullough.

21             Mr. Moss.

22             MR. MOSS:  Thank you, Your Honor.

23             Your Honor, I join in Mr. McCullough's sentiment

24   that I would say that I don't envy the decisions that Your

25   Honor has to make.

16

1            THE COURT:  Well, I have to compliment both sides

2      on their sentencing materials.  They were thoughtful and

3      thorough.  And Mr. Moss, I do appreciate the report you

4      provided.  The report you provided was one of the more

5      helpful kind of reports of that nature that I've received,

6      so I appreciate that.

7            MR. MOSS:  I'm happy to hear that, Your Honor.

8      Thank you.  We spent a lot of time trying to find the right

9      person for Mr. Finley, and I do believe that with Nicholas

10      Trietsch we have found a person who has the education and

11      the skills to guide Mr. Finley but also, Your Honor, this

12      wasn't stated in the memorandum, but Mr. Trietsch also

13      shares the same experience as being a biracial man in

14      America.

15            THE COURT:  Let me ask you something.  Is that --

16      was his consultation with Dr. Trietsch or Mr. Trietsch a

17      one-time thing or is this a course of treatment that he is

18      intending to continue?

19            MR. MOSS:  It's a continuing thing, Your Honor.

20      We paid for the first eight sessions.  At that time

21      Mr. Finley did not have health insurance, but we did feel

22      that someone like Mr. Trietsch with his background of social

23      worker therapy is what was needed in this case.  And I have,

24      you know, seen a lot of growth with Mr. Finley, including,

25      Your Honor, that Mr. Treach helped Mr. Finley get health

1    insurance and, you know, helped him maintain his employment.

2            And so right now Mr. Finley is in a place where he

3    can continue getting services from Nicholas Trietsch in the

4    community and it will be paid for by his health insurance

5    and the money he makes while he is employed.

6            THE COURT:  Okay.

7            MR. MOSS:  And I understand, I believe he's going

8    to speak with the Court about this, but that those services

9    are continuing beyond the eight that we paid for and that

10   they have spoken and, depending on the results of today,

11   will be scheduling additional appointments.

12           THE COURT:  All right.  Well, I hope that they

13   will, regardless of the results of today, will continue even

14   if they have to be interrupted, and I'm not saying they will

15   be, but thank you.

16           MR. MOSS:  Understood, Your Honor.

17           THE COURT:  All right.  You may proceed.

18           MR. MOSS:  So, Judge, I agree this is a tough case

19   and the stakeholders haven't necessarily made it easier with

20   probation requesting 180 days, the DOJ requesting 90, and of

21   course us requesting the low end.

22           THE COURT:  I'm not intending on giving six

23   months.

24           MR. MOSS:  Understood, Your Honor.  I would state,

25   Your Honor, that Mr. Finley has not lost sight that January

1    6th took place in the context of something larger.  He is

2    familiar with Your Honor's words, "A mob isn't a mob without

3    the numbers."  The people who were committing those violent

4    acts, they had the safety in numbers.  I have gone over that

5    with him.  I think Your Honor's words are well taken.

6    Mr. Finley accepts his responsibility goes past the part

7    that he played into the whole of January 6th.

8            I think that his conduct absolutely did take place

9    in the context of something larger and presently, Your

10   Honor, I believe that Mr. Finley has genuine remorse, even

11   possibly grief might be a better word for it, all in that

12   larger context including, Judge, the question of why he felt

13   safe in those numbers.  Who and how, from who and how that

14   false sense of security could arise in him?  He's

15   confronting these issues right now.

16           And I think that frankly he's feeling remorse for

17   January 6th all the way back to the very first feelings of

18   ambivalence he had in life about the why, the who, and the

19   how of his life.

20           I think he's grappling, Judge, with very real

21   human failings and in this case I do believe they mitigate

22   more than magnify the punishment and sentence that must

23   ensue.  And that's because, Judge, I think that these human

24   failings he has spent now five or six months, ever sense he

25   got in -- he has sincerely been confronting these issues

19

1    post-offense ever since he started services with

2    Mr. Trietsch.  And that is in large part thanks to

3    Mr. Trietsch.  He seems like an excellent therapist having

4    spoken with him and having seen the change I've seen in

5    Mr. Finley.

6           But, Judge, I don't think it is lost on the Court,

7    or any of us, that for the first time Mr. Finley is

8    genuinely processing the parts of himself that are

9    intertwined in this case.  The parts that were impacted by

10   transgenerational trauma.  There I'm speaking about his

11   mother with PTSD, and I just make reference to paragraph 62

12   in the PSR for the facts behind that.  The part that

13   struggled to form an intrinsically fierceness about him.

14   The part that never found friends or never felt he fit in

15   perhaps because he moved, you know, ten times within ten

16   years of his life between three and thirteen.  That

17   disruption.

18           And all of those parts, Your Honor, then that

19   turned to self-loathing.  I think that's what he is

20   confronting right now.  Not only those parts, but how they

21   impacted him and how he first tried to approach them alone,

22   isolated but through self-loathing.

23           I think those parts made him highly vulnerable to

24   recruitment from the Proud Boys.  I laid that out in the

25   sentencing memorandum.  And I think they were then the same

1    parts that essentially blinded him with loyalty to a belief,

2    Your Honor, to a belief that the Proud Boys would give him

3    the sense of community that he had been always searching

4    for.

5         And it was that sense of community, Judge, I think

6    that Mr. Finley was incredibly desperate for when in or

7    around I think it was 2016/2017, he was essentially

8    blindsided by learning -- well, the fullest picture to date

9    of what was contained in paragraph 62 of the PSR.

10        He joined the Proud Boys after learning that a

11   family friend kind of told him that.  And I think it was

12   sort of a drip, drip.  In some of the progress notes from

13   his mother's at the V.A., she talks about all of the

14   struggles with bringing this up to him, and I just think

15   that for whatever reason she never could.  A family friend

16   brought those facts to him in 2016/2017.  He joined the

17   Proud Boys in 2018.

18        I think he got blindsided by the fact that he did

19   not know what he thought he knew about himself up to that

20   point and why.  And he never -- even when he found out in

21   2016/2017, he did not go to his mother.  As the Court's

22   aware, she raised him in a single-parent household.  She was

23   serving in the military.  I think that their relationship

24   evolved in a way where he felt protective of her and didn't

25   want to speak with her about that out of a sense of trying

1    to protect her.

2          And even after he spoke with his mother -- and,

3    Judge, one of the main reasons I looked to find Nicholas

4    Trietsch is because right before the PSR interview, I

5    learned that him and his mother had never spoken about this,

6    and I had them sit down and talk about it and I quickly

7    realized I am well in over my head on that issue.  And so I

8    reached out to an expert in the community who I thought

9    could help.

10          But even after they spoke, I think that

11    conversation is ongoing.  And I think it's shown by the fact

12    that even after they spoke he still did not know his

13    father's name until it was disclosed in the PSR.  And it is

14    true, that was a lot for him to process and he is still

15    actively processing that.

16          And I just ask the Court to keep in mind that up

17    until kind of that point of publication in the PSR, he had

18    never really had any significant, professional mental,

19    emotional, therapeutic, you name it, any kind of help, let

20    alone someone like Nicholas Trietsch which, as I stated

21    earlier, someone who is not only trained to help someone

22    process all these issues but who shares that experience of

23    being biracial in America.

24          And he has never before had the opportunity, the

25    resources, the guidance to process any of these demons of

1   the transgenerational trauma, the absence of a father, no

2   sense of self, lack of community, racial discrimination that

3   seemed to meet him at every step, particularly when he moved

4   to West Virginia.  He never had help in those areas.

5           I think in that absence he filled them with

6   overcompensation trying to protect his mother, trying to act

7   as the man of the house; and frankly, internalized

8   self-hate, and I think that drove him to a very reactive but

9   equally fragile place.  And around learning about more

10  information about his father in 2016/2017, Judge, I think a

11  part of him broke and I think that the Proud Boys were there

12  to pick up those pieces all too willingly.

13          And then that's the part of the sentencing

14  memorandum that talks about how, you know, he was someone

15  who was highly vulnerable to recruitment, laying out

16  those -- that study from the Hague that talks about how the

17  Proud Boys target, you know, not only people lacking

18  community but men who are in states of precarity or are

19  feeling misunderstood and who are numbingly desensitized.

20  And I think when I found Mr. Finley, he was numbingly

21  desensitized and I think he is coming around to

22  understanding how he reached that thought process.

23          But, Judge, suffice it to say that to bring up

24  they had safety in numbers, I think for all the wrong

25  reasons he felt safe in those numbers.  And I think this

1    case, there's an absolute silver lining here that this case

2    showed him how wrong he was and it has had him confront

3    these issues that he likely would not have confronted

4    otherwise.

5         I will say, Your Honor, that to the extent that

6    probation was requesting six months because of his role in

7    the Proud Boys, he has -- well, his part with the Proud Boys

8    has ended.  He has, as I understand it, disavowed any

9    association with the Proud Boys as I spoke about in Exhibit

10   1 that is before the Court.  Although he has done that, set

11   to move on, he understands that he remains accountable for

12   that association and I think he understands that that

13   association very likely means a possible prison sentence

14   here.

15        And I spoke with him about that even before Your

16   Honor addressed what Your Honor had spoken with probation

17   about, so he was cognizant of that coming in.  Even so,

18   Judge, over the past two years, particularly the last five

19   or six months, ever since he started into therapy, I would

20   say that I'm proud to see a lot of growth in Mr. Finley.

21        And I would like to share one thing.  He has

22   allowed me to share this with the Court.  He called me after

23   his first therapy session with Mr. Trietsch and I think that

24   was notable to me, Judge, because he's not the type of

25   client who calls often.  It was also notable because, Your

1    Honor, it didn't sound like Jeffery Finley on the phone.

2    And that might not be the best way to say it.  It might be

3    better to say for the first time it sounded like Jeffery

4    Finley on the phone.  He sounded self-assured.  He sounded

5    confident.  He sounded steady, even happy like some weight

6    had been lifted.

7            What he told me at that moment, Your Honor, and

8    this is why I bring it up, he told me it was the first time

9    that he had spoken with another biracial person about the

10   experience of being biracial in America.  I think that

11   explains his voice on the phone on that day.  For the first

12   time he felt safe.  Felt safe being a biracial man in

13   America.  Somebody who validated that experience and walked

14   him through it, and there was about 30 years to walk

15   through, right?  And I think they are still going through

16   that.  Him and his therapist.

17           And, Your Honor, I'm not offering this to excuse

18   absolutely anything of what happened on January 6th.  What

19   took place there is an incredibly serious matter and none of

20   the mitigation here is an attempt to minimize that.  I think

21   Mr. Finley takes full responsibility for his offense

22   conduct.  The point that I'm trying to make is that I think

23   he not only takes responsibility for his offense conduct but

24   he also takes responsibility for addressing the parts of his

25   history and characteristics that led to these mental and

1    emotional conditions that significantly contributed to this

2    case.  He is sincerely trying to figure the route of why he

3    wanted to join the Proud Boys.

4         I'll say that he has shown significant progress

5    throughout his therapy sessions with Mr. Trietsch.  And

6    again, Judge, this is new.  They started maybe five or six

7    months ago, so it is fairly new.  I think they have a long

8    way to go.  He has also, you know, maintained steady

9    employment and, as I was mentioning to the Court earlier,

10   through Mr. Trietsch helping him get insurance and through

11   his employment, those sessions will continue.

12        THE COURT:  All right.

13        MR. MOSS:  So, Judge, by every indication here I

14   think that continued community integration and treatment

15   will result in further breakthroughs that will yield

16   significant improvements to his mental and emotional

17   conditions, and I think in the most significant and

18   effective way meet the goals of 3553(a) too.

19        And Mr. McCullough referenced this that we are

20   approaching this from perhaps slightly different theological

21   philosophies.  I would offer that I think through

22   rehabilitation, continued rehabilitation in his case because

23   he is proving successful on it and it is proving to really

24   be helping him process a lot of the root causes here, I

25   think that that will do more to reduce his risk of

1    recidivism and protect the public than a 90-day prison

2    sentence.

3            I would say that, you know, for purposes of

4    reducing recidivism and protecting the public and for his

5    own post-offense rehabilitation, for no small reasons and

6    his efforts in post-offense rehabilitation, we would ask

7    that Your Honor craft a sentence that allows him to maintain

8    his employment and allows him to, most importantly, maintain

9    these sessions with Mr. Trietsch.  I believe they meet once

10   or twice a month, and of course I believe conditions could

11   be crafted to make those meetings take place more, more

12   frequent.

13           And I think that a low-end guideline sentence, a

14   sentence that's again consistent with the guidelines, could

15   allow for that, either through an extended term of

16   probation, understanding the Court can give him up to five

17   years of probation and if he made a mistake, we can

18   resentence him to incarceration or, Your Honor, intermittent

19   confinement which would allow him to remain employed and

20   continue these therapy sessions.

21           It is a case that raises many difficult questions

22   under the 3553(a) factors, Judge.  I would trust Your

23   Honor's discretion.  I would just request that Your Honor

24   consider crafting a sentence that promotes community

25   rehabilitation because it does appear to be working for him.

```
 1                THE COURT:  Thank you, Mr. Moss.

 2                Mr. Finley, when you pleaded guilty, and I was

 3      just checking my documents, it was almost a year ago today.

 4      I told you at the time that you have an absolute right to

 5      speak at your sentence, and you also have an absolute right

 6      not to.  And it is your right not to, and if you chose not

 7      to speak I would not punish you for it or hold it against

 8      you in any way.  It would ultimately be your decision.  So

 9      is there anything you would like to say?

10                THE DEFENDANT:  Yes, Your Honor.

11                THE COURT:  Come on up.

12                THE DEFENDANT:  My mask?

13                THE COURT:  It's up to you.

14                THE DEFENDANT:  Thank you for giving me time to

15      speak.  I would like to first lead off with saying that my

16      participation in January 6th caused irrevocable harm to the

17      fabric of political discourse in America and I regret ever

18      being part of that in any capacity.  From the moment that I

19      got arrested to today, I have never once denied the fact of

20      my involvement and I have never denied that I regretted my

21      actions there that day.

22                Since then I have, as Mr. Moss has said, I've

23      sought out therapy.  I'm coming to terms with internalized

24      racism and things of this nature in terms of trauma.  I'm

25      growing closer to my faith in God.  I'm actually trying to
```

1    become a Catholic currently.

2           I have maintained my steady job, my health

3    insurance so I can make sure that those therapy sessions

4    that I'm going to be engaging in for quite some time are not

5    as expensive.  And I have distanced myself, left and then

6    eventually disavowed the Proud Boys organization as well, up

7    to and including booking an appointment to covering up my

8    Proud Boy tattoo that I currently have.

9           Outside of that, I actually just want to thank you

10   for your time and any decision you make today I fully

11   welcome, accept, and I'm actually thankful for because it

12   will mark an end to the chapter of the biggest mistake I

13   have made in my life; and I can move forward because there

14   has been a lot of blow back, loss of friends, some family

15   members don't want to speak to me, online banking platforms

16   that no longer keep me on, things of that nature.  So I

17   think I'm going to have to live with my decision for quite

18   some time, and I think this has been a good step forward and

19   I thank you so much for your time.

20           THE COURT:  Thank you, Mr. Finley.

21           This is -- sentencing is the hardest part of my

22   job and the part I like the least, but it is what I took an

23   oath to do and it's important and I have to do it.

24           These cases, these January 6th cases, as all

25   criminal cases do, present a host of complicated issues

1   because people are complicated.

2          I start out by saying as a former public defender

3   myself I'm immensely proud that the criminal justice system

4   in this country has a lot of flaws but in this case, and in

5   many of the other cases that have come before me, I see the

6   finest traditions of our system working very hard to make

7   sure there's fairness on both the side of the government,

8   which has spent incredible amounts of resources and time

9   prosecuting these cases and treating them individually, and

10  Mr. McCullough has put on a very fair and reasonable and

11  balanced presentation.  And then Mr. Moss has done just an

12  excellent, excellent job in humanizing his client and caring

13  for his client and presenting his story with some passion.

14          In the federal system, especially with the

15  guidelines, there's always the danger of reducing a

16  defendant to a series of calculations and numbers.  And each

17  defendant is an individual with a story, with someone who

18  loves him, and it is -- it is always important that I keep

19  in mind that I not reduce any case to just a series of

20  calculations, and the parties have done a very good job in

21  making sure that all the complexities of this case are

22  brought forward and I appreciate that.  It doesn't make my

23  job any easier.

24          But, Mr. Finley, you're 30 years old.

25          THE DEFENDANT:  Yes, Your Honor.

1           THE COURT:  It may seem old to you but it's not

2      from -- you're very young from where I sit.  I mean, the

3      government has talked about and I have talked about ad

4      nauseam the nature and circumstances of the offense because

5      that's one of the circumstances I have to consider under

6      3553(a), and there's no, you know, there's no diminishing

7      how serious the events of that day were.  They -- they

8      rendered the fabric of our community and of our democracy.

9      They exposed dangerous fault lines that maybe many of us

10     weren't aware that existed.

11          And frankly, to anybody who thinks that January

12     6th couldn't happen again, you're not getting the same

13     reports and information that many of us in the judiciary and

14     law enforcement are getting that there are just people that

15     are out there who have determined that next time it will

16     succeed.

17          So I take these cases very seriously, but I take

18     each defendant individually and I have to consider each

19     defendant's individual participation.  And Mr. McCullough is

20     right.  I have been -- or I have never heard myself quoted

21     so often as I do in every single case, but it's true, a mob

22     isn't a mob without the numbers.  And by your presence

23     there, Mr. Finley, on January 6th you enabled that mob to

24     almost succeed in overthrowing the government and basically

25     stopping the peaceful transfer of power that is something we

1    all take for granted for a long time.

2              And your participation was more organized and more

3    calculating than your average supporter who came to hear a

4    speech, got caught up in the crowd, marked it down, and sort

5    of got swept away.  And I want to emphasize that because I

6    emphasize it in every case.  I emphasize that because I

7    don't -- normally your political beliefs do not have any

8    relevance to me in a sentencing.  I am an immigrant and one

9    of the things I love about this country is the freedom that

10   every person here has to express their own views, no matter

11   how virulent somebody else might find them to be because the

12   Constitution protects everyone.

13             And so I'm not punishing you because you joined

14   the Proud Boys and because you may have -- you may hold

15   beliefs that other people might find abhorrent.  But your

16   membership in an organization -- I mean, there's a bunch of

17   them on trial next door in an organization that conveyed an

18   organized message of assisting in the destabilizing of our

19   government on January 6th is different.  And so I do view

20   your participation in the events of January 6th as a leader

21   of that particular chapter a little differently than

22   somebody who just came to hear the former president speak

23   and wandered around and got caught up.  It was a more

24   organized and, dare I say, almost dispassionate involvement.

25             I noticed how you were dressed in the photographs.

1    You were, you know, it was a serious occasion for you.  You

2    took photographs flashing the sign of your organization.

3    You communicated with other leaders of the organization who,

4    even if you weren't, they were hell bent on getting inside

5    that building and causing problems.

6              And you went inside.  You saw the law enforcement

7    officers who were outnumbered and fighting to try and hold

8    the Capitol.  You saw the tear gas, you heard the alarms,

9    you saw what was going on and you still went inside.  And

10   even though there's no evidence that you broke anything or

11   stole anything or fought with law enforcement -- and if

12   there had been you would be charged with a felony, so you're

13   getting the benefit of that lack of participation -- but you

14   stood in the doorway of a Senate office where people were

15   inside engaging in desecration of governmental property, and

16   those are the people with whom you threw in your lot.

17             And so while I don't believe that that merits a

18   six-month sentence as probation does, I think their

19   recommendation is based on that participation.  And so I'm

20   heartened that you have left the organization and disavowed

21   your membership.  I do wonder if you had not been arrested

22   in this case whether that would be the case, but it doesn't

23   really matter because, as you said, that's a positive thing

24   to come out of it, and I take you at your word and I believe

25   you're sincere in that belief.

1        But I have to view your participation in the

2   events of the 6th in the light of your membership and

3   leadership of the organization, and your telling people, "If

4   you come out, you can't get back in," and your instructing

5   other members to delete their -- once the events were over

6   and you realized, like a lot of people did, that there were

7   going to be repercussions, legal repercussions arising out

8   of participation, you encouraged members to delete

9   information, destroy information, and you initially, you

10  know, went online and went on social media and lied.

11       So I believe there's been a sea change in your

12  view.  I believe you have come around to understanding that

13  what you did -- I hope you've come around to understanding

14  the seriousness of what you did, but it wasn't on your own.

15  It was I think with an awareness that you were in trouble.

16  But it happened, so that's something.

17       With regard to your characteristics as an

18  offender, you have never had -- you never even had a traffic

19  infraction.  You have no criminal record.

20       Starting with the days I was a public defender and

21  even today as a judge, I see so many people before me, not

22  just in January 6 cases but in criminal cases, who ended up

23  in the criminal justice system not necessarily as a way to

24  get rich or not because they were violent but because they

25  were searching for approval and belonging.

1      The little 14-year-olds who were out on the street

2    running drugs for the corner boys and holding drugs and

3    getting caught up in the corner drug trade time and time

4    again started doing that because they were looking for

5    approval and community from the older young men and the

6    older men in that trade.  They were looking for fathers

7    because they didn't have any.  They were looking for male

8    approval.  Sometimes young women, too, they were looking for

9    male approval because they didn't have any in their lives.

10    They were looking for community and belonging.

11      And I don't mean to sound, you know, hippie dippy,

12    but that's what I see.  There's money, there's violence,

13    there's all of that.  But gangs, if looking for a family, if

14    you're looking for a sense of community -- you have your

15    mom, you're close with her.  It's just been the two of you.

16    But your mom, for her own reasons, was processing her own

17    trauma; and the two of you, tight-knit unit that you were,

18    couldn't help each other.  Moving around all the time,

19    having no extended family support, having no male support.

20      And so you found support, finally, in the Proud

21    Boys in the same way that other people find support in the

22    gangs and in the drug trade.  And frankly, I see -- I've

23    seen other January 6th defendants who are isolated or

24    searching in the same way for community.  They go online and

25    they go on the Internet and they find these whole groups and

1    everybody is telling them they are great and they all

2    believe each other, and they believe the fiction that they

3    are hearing and it forms a community for them.

4          And that's what I've seen there.  They meet

5    friends they have never met before at the Capitol that day

6    and it's all a big sense of we're all in this together until

7    they realize, hopefully most of them, that they have been

8    duped.  And I'm sensing that that's what happened with you.

9          And it is very complicated.  We see -- I see these

10   cases and people on the outside who aren't in the system see

11   these cases and they are like, Oh, they are all traitors,

12   lock them up.  They are all drug dealers, lock them up.

13   It's not that simple.  Every one is complicated and your

14   case is very complicated.

15         You're loved by your mom.  You have -- you have

16   taken steps to try and come to terms with a lot that's gone

17   on in your life and a lot that has been missing in your

18   life, and it is to your credit that you're doing that and

19   that you -- that you've started engaging with a therapist to

20   help you.  I have to tell you that no matter what happens,

21   you really must continue that because one thing that is true

22   is that hurt people, it really is very true, you can't deal

23   with your circumstances on your own because that's how you

24   end up in the Proud Boys.

25         In terms of the types of sentencing available, I

36

1      have already mentioned that probation is recommending six

2      months, the government is asking for three months.  You know

3      I've given a range of sentences in this case.  There is a

4      need to avoid unwarranted sentence disparity.  I look in

5      every single one of these cases -- it's hard to compare the

6      January 6th cases to other cases because they are so unusual

7      and so unprecedented -- but I do look at the chart the

8      government gives me.  I look at all my other cases to see

9      where you fall in terms of your culpability, your

10     background.

11             In the past five years, ten defendants in this

12     circuit have been sentenced under Section 2B2.3 who, like

13     Mr. Finley, have a criminal history category of I, an

14     average length of imprisonment was four months and the

15     median was three months, and the average median term of

16     supervised release was 12 months.  In *United States versus*

17     *Larocca*, another case of mine, the defendant was also

18     convicted of entering and remaining in a restricted

19     building.  I sentenced him to 60 days of imprisonment.  We

20     talked about the *Mazzocco* case.  There's a been a wide

21     range.  Mr. Mazzocco I gave 45 days.  I do not believe there

22     was any obstruction in that case.

23             But the factor I have to consider in these cases,

24     almost one of the more important factors, is deterrence.  Do

25     I think you are at a high rate for recidivism?  No.  I think

1    you have learned your lesson.  You have never committed a

2    crime before.  I strongly suspect, although I have been

3    wrong before, but I strongly suspect that you do not intend

4    to fall on the wrong side of the law again.  But there has

5    to be individual deterrence.  And there has to be

6    generalized deterrence and, I've said this before, it has to

7    be made clear to anybody who thinks of doing this ever again

8    that there will be consequences, certain consequences,

9    serious consequences, consequences including imprisonment.

10             And I don't impose imprisonment lightly.  I've

11   spent a lot of time in prison and jails.  Every day that is

12   literally taken from you is a serious day in my mind.  So I

13   don't give prison sentences lightly.  I will give them

14   because I think certain circumstances warrant them.  So the

15   general deterrence is very, very strong here and the

16   seriousness of the offense is very, very strong.  Weighs

17   very heavily with me here.

18             One of the things I heard from you, Mr. Finley,

19   was remorse, regret for your participation in this offense,

20   but one of the things I did not hear from you was an

21   understanding of what your participation did and the acts of

22   the Proud Boys and the other people who participated in

23   January 6th, what they did to the real victims in this case

24   who were the people inside that building.  The law

25   enforcement officers who were valiantly, in my opinion,

1    trying to defend that building.  Who are the patriots that

2    day?  The people inside that building who are trying do

3    their job, scared to death thinking that they wouldn't see

4    their families again.  Calling their children to tell them

5    good-bye; hearing gunshots and glass breaking and not

6    knowing if they are going to make it out alive.

7            Those people continue to suffer posttraumatic

8    stress.  Those officers, I have had them testify before me.

9    Some have had to retire early.  Some of them committed

10   suicide.  Some still struggle with suicidal ideation.  Some

11   are not able to do the job they love, and they have all been

12   injured in one way or another and they are all struggling

13   with the aftermath of what they were involved in on January

14   6th.  Those people are the victims here.

15           The collective -- the country who watched, the

16   rest of the country who watched in horror what was going on,

17   the citizens of the District of Columbia who felt under

18   invasion from those people who mobbed the Capitol, as well

19   as members of your organization -- I'm not saying you

20   were -- but who were roaming the city looking for fights,

21   those are the victims on January 6th.

22           I didn't hear an awareness of what your actions

23   caused people to suffer.  You know, you have suffered.  I

24   mean, you're going to suffer the consequences of this for a

25   while and that's unmistakable, but I really am not hearing,

1    over and over again in many of the people that come before

2    me a real understanding of the damage that they caused.  And

3    I'm not saying you're not aware of it.  I'm just saying I'm

4    not hearing it.

5         So I'm struggling to put all of these things, your

6    genuine remorse, your desire to straighten up your life,

7    with the seriousness of the offense and the need for

8    deterrence, to come up with a sentence that I believe is

9    fair in this case.

10        You stand, Mr. Finley, with your lawyer.

11        Based on my consideration of all 3553(a) factors,

12   the Court believes and will sentence, and it is the judgment

13   of the Court, that you, Jeffery Finley, are hereby committed

14   to the custody of the Bureau of Prisons for a term of 75

15   days on Count 1.  It's not three months, which is kind of

16   where I was leaning to, and it's not two months.  But I

17   think -- and again, it's a matter of degrees here.  I

18   believe it does reflect what I believe is your genuine

19   determination to better yourself and what I believe is your

20   awareness and the steps you've taken to leave the path that

21   you were on.

22        So you are hereby committed to the custody of the

23   Bureau of Prisons to a term of 75 days on Count 1.  You're

24   further sentenced to serve 12 months on supervised release

25   and to pay a $25 special assessment.

1        You are also ordered to engage in 60 hours of

2   community service.  I can't tell you what you must do.  I'll

3   tell you it cannot be an online community service program

4   because I've had that happen before.  It would be great if,

5   as part of your community service, that you could do some

6   outreach to other young people who are struggling.  West

7   Virginia is not exactly the most progressive state in the

8   country when it comes to race relations.  I don't think

9   anybody is going to argue with me about that.  I have read

10  about what you suffered when you were there, and it might be

11  helpful and paying it forward to help other young people who

12  are struggling with those same issues of identity that you

13  have had to deal with.  Anyway, 60 hours of community

14  service.

15        A special assessment is immediately payable to the

16  Clerk of the Court of the U.S. District Court for the

17  District of Columbia.  Within 30 days of any change of

18  address, you shall notify the Clerk of the Court of any

19  change and until such time as the obligation is paid in

20  full.

21        Within 72 hours of release from custody you shall

22  report in person to the probation office in the district in

23  which are you're released.

24        While on supervision, you shall submit to

25  collection of DNA.

1          You shall not possess a firearm or other dangerous

2     weapon.

3          You shall not use or possess any illegal

4     controlled substance, and marijuana is illegal in the

5     federal system.

6          And you shall not commit another federal, state,

7     or local crime.

8          You shall also abide by the general conditions of

9     supervision adopted by the U.S. Probation Office, as well as

10    the following special conditions:

11         You must complete 60 hours of community service

12    within 12 months.  A probation officer will supervise your

13    participation in that program and you have to have written

14    verification of completed hours for the probation officer.

15         You shall remove firearms, destructive devices, or

16    other dangerous weapons from areas of which you have access

17    or control until your supervision term expires.

18         The probation office shall release the Presentence

19    Investigation Report to all appropriate agencies in order to

20    execute the sentence of this Court.

21         As set forth in the plea agreement, the government

22    plans to move to dismiss the remaining counts of the

23    Information pursuant to Mr. Finley.  Mr. McCullough, do you

24    do so now?

25         MR. MCCULLOUGH:  Yes, Your Honor, we move to

1    dismiss Counts 2 through 4.

2             THE COURT:  That motion is granted.  Those counts

3    will be dismissed.

4             Probation, are you -- I'll allow -- I'm not going

5    to transfer supervision of this case, jurisdiction of this

6    case, but I will allow -- is probation asking for -- your

7    supervised release can be supervised by a probation office

8    in your home state in West Virginia.  I will allow that to

9    be supervised there, but I will retain jurisdiction of this

10   case.  Which means that if you mess up or commit a crime or

11   violate the conditions of supervised release, you will be

12   coming to see me and that will make me very unhappy.

13            Pursuant to 18 U.S.C., Section 3742, you have the

14   right to appeal the sentence imposed by this Court subject

15   to certain rights of appeal that you waived as part of your

16   plea agreement in this case.  If you choose to file an

17   appeal, you must file an appeal within 14 days after I enter

18   judgment.  If you're unable to afford the costs of appeal,

19   you may request permission of the Court to file an appeal

20   without cost to you.

21            Now, Mr. Finley, with regard to your status

22   pending incarceration, because you have been on pretrial

23   release and generally, there have been some blips, but

24   generally complied, are you asking -- do you have any

25   objection to voluntary surrender?

CARLA R. BEBAULT, RMR, CRR, FCRR

43

1          MR. MCCULLOUGH:  No, Your Honor.

2          THE COURT:  I'm going to allow you to voluntarily

3     surrender in this case because you have complied.  You have

4     come to court when you were supposed to come to court, so

5     I'm going to allow you to surrender.  Your lawyer and

6     probation will coordinate when you are to turn yourself in.

7     If you don't turn yourself in on your surrender date, you

8     will be charged with an additional crime.  Any punishment

9     for that crime will be consecutive to any punishment in this

10    case.

11         And if you violate any of your conditions of

12    release while on release pending surrender, again, you can

13    be subject to any enhanced penalties consecutive to any

14    sentence in this case.  And if you pick up any new charges,

15    similarly you could be subject to enhanced penalties which

16    would be served consecutive to any sentence in this case.

17         So the short answer is you don't want to mess up.

18    You want to comply with the conditions of release and stay

19    out of trouble until the day that you're supposed to

20    voluntarily surrender.

21         Mr. Moss, do you have a recommendation for a

22    facility?

23         MR. MOSS:  Yes, Your Honor.  FCI Morgantown.

24         THE COURT:  All right.  I would strongly recommend

25    that Mr. Finley be allowed to serve -- be placed at the West

44

1    Virginia Morgantown Bureau of Prisons to serve a sentence
2    which will enable him to be close to his home, his mother,
3    and his community.
4         Mr. Finley, I say this a lot and I mean it, and I
5    mean it in your case, that someone who I admire is a man
6    named Bryan Stevenson who said, "We are not the worst thing
7    we ever do."  Your participation in this offense, your
8    participation in the Proud Boys, is not who you are.  It's
9    what you did.  It should not define you for the rest of your
10   life.  It may dog you, you may have to explain it, but
11   you're 30.  You have a long life ahead of you and one of the
12   things that show our character and what you're made of is
13   what we do when we have messed up.  How you live your life.
14   How you pick yourself up.  How you move on.  How you move
15   forward.  Do you allow yourself to be bitter and drag you
16   down or do you allow yourself to chart a new path.
17        I think you're on the way.  It is so important
18   that you continue to do therapy.  It's so important that you
19   continue with all the efforts to remove yourself from the
20   life you were living and the people you were associating
21   with that brought you here today and move in a different
22   direction.  I think you have the ability to do that and so I
23   wish you good luck, sir.
24        THE DEFENDANT:  Thank you, Your Honor.
25        THE COURT:  All right.  Anything further?

1          MR. MCCULLOUGH:  No, Your Honor.  Thank you.

2          THE COURT:  Thank you.

3          MR. MOSS:  Thank you.

4          THE COURTROOM DEPUTY:  All rise.  This Honorable

5     Court stands in recess until further court.  Good day,

6     everybody.

7

8          (Court adjourned at 2:40 p.m.)

9                         *     *     *

10

11

12          I, Carla R. Bebault, certify that the foregoing is

13     a correct transcript from the record of proceedings in the

14     above-entitled matter.

15

16

17          Certified by:  s/Carla R. Bebault
                           Carla Bebault, RMR, CRR, FCRR
18

19

20

21

22

23

24

25